UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CYNTHIA SASSER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) NO. 3:14-cv-1180 |
| v. | ) JUDGE CRENSHAW |
| | ) |
| ABF FREIGHT SYSTEM, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

Cynthia Sasser filed this action against her former employer, ABF Freight System, Inc. ("ABF"), challenging her termination under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8–50–103, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4–21–101, *et seq*. (Doc. No. 1.) For the following reasons, ABF's Motion for Summary Judgment (Doc. No. 23) is **GRANTED**.

**I.  Undisputed Facts**

In November 2011, Sasser began working as an account manager at ABF, a shipping company. (Doc. No. 29 at 3.) Her primary job duties were to develop new sales opportunities and new price-controlled revenue for existing customers. Id. Account managers solicit business by researching trade publications, making cold calls, and making in-person visits. (Id. at 4.) Account managers are also expected to generate sales opportunities through making pricing proposals. (Id.) Given the nature of ABF's business, face-to-face contact is an essential function of the account manager's position; the majority of an account manager's work day involves driving to meet

customers for in-person visits, which allows them to get to know their customers and understand their businesses. (Id.) Sasser reported to Barry Smiley, a District Sales Manager and Nicholas Ricke, Branch Manager for Nashville, who oversees operations and sales. (Id. at 2-3.) Dan Griesse served as Director of Human Resources, and was located in Arkansas. (Id.)

In February 2012, Smiley gave Sasser feedback that she needed to spend more time meeting with her customers in-person, listen better to customers, and improve her understanding of ABF's services to improve her sales. (Id. at 9-10.)

In May 2012, Sasser attended a four-day sales training at ABF's corporate office in Arkansas. (Id. at 10.) The training did not cause her performance to improve; her revenues and proposals were still below the company's expectations. (Id. at 10-11.) Damien Bates, then director of Strategic Solutions, tracked sales opportunities from all account managers. He observed Sasser's performance and believed her results were unsatisfactory because she did not make enough face-to-face customer sales calls. (Id. at 11-13.) He had monthly meetings with Smiley and Ricke to discuss revenue figures. (Id. at 12.) Sasser's poor performance and lack of sales opportunities was often a topic of discussion at these meetings. (Id.)

In August 2012, Ricke and Smiley told Sasser that her productivity needed significant improvement to justify her continued employment. (Doc. Nos. 29 at 11; 25-1 at 70.) On August 27, 2012, Smiley sent Sasser an email outlining the ways in which her performance fell short of his expectations. (Doc. No. 29 at 13.) Around this same time, Ricke and Smiley also spoke with Griesse about terminating Sasser for poor job performance. (Id. at 13-14.) Griesse encouraged them to give her additional time and to work with her to improve her performance. (Id.)

On August 29, 2012, Smiley and Ricke again met with Sasser to discuss her performance issues and put her on a 60-day review that required her to provide Smiley with a report every

afternoon explaining whether her sales calls were successful and, if not, the reasons for the lack of success. (Id. at 14.) ABF's managers continued to find that Sasser's revenues and proposals were below expectations throughout the fall of 2012 and discussed this with her at several monthly meetings. (Id. at 15-16.) Sasser acknowledges that her supervisors were displeased with her work, but she does not agree that her performance was inadequate. (Doc. Nos. 29 at 9; 25-1 at 70-72.) Additionally, she believes that ABF intentionally caused her to fail by assigning her accounts that were inactive or did not belong to her, which artificially lowered her sales figures. (Doc. No. 29 at 15-16.)

In December 2012, Smiley and Ricke again spoke with Griesse about terminating Sasser's employment because of her poor performance. (Id. at 17.) Griesse again told them to continue to work with her to improve her performance. (Id.) Smiley and Ricke continued to be displeased with Sasser's performance throughout the spring of 2013. (Id. at 17-18.)

In March 2013, Smiley and Ricke discussed terminating Sasser with Russ Wynia, Regional Vice President of Sales, who agreed that it was appropriate to terminate her employment. (Id. at 19.) On March 26, 2013, Smiley sent an email to Griesse, Ricke, and Wynia, seeking their approval to terminate Sasser's employment. (Id.; Doc. No. 25-7 at 23 (email)). Wynia responded that day indicating his agreement with the decision to terminate her. (Id.) Griesse reviewed Sasser's monthly reports, spoke with Ricke and Smiley about Sasser's ongoing job performance issues and their perception that she was unwilling or unable to improve her performance or meet job expectations, and then agreed that her employment should be terminated. (Doc. No. 29 at 19.) Also on the same day, Griesse gave Smiley and Ricke the authority to move forward with terminating Sasser, but left the timing of the termination to their discretion. (Id.) When the decision to terminate Sasser was made on March 26, 2013, she had no physical or mental impairments or limitations

that impeded her ability to perform her job duties, nor had she ever requested an accommodation of any type. (Id. at 20-21.) Smiley and Ricke decided to terminate Sasser's employment at her next monthly meeting scheduled for April 16, 2013. (Id. at 20.)

On March 27, 2013, Sasser was involved in a car accident. (Id.) She missed work on March 28, 2013, but returned to work on March 29, 2013 with no restrictions. (Id. at 21.)

On April 9, 2013, Sasser missed work again because of her accident and called Tina Hufstetler at ABF's corporate human resources office to request FMLA leave. (Id. at 23.) Sasser had no conversations with Ricke between the day of her accident and her phone call with Hufstetler on April 9, 2013. (Id.) On April 10, 2013, Griesse repeated to Smiley his approval for Sasser's termination. (Id. at 22.) Smiley and Ricke decided to terminate Sasser on April 16, 2013, as planned. (Id.) On Friday, April 12, 2013, Sasser gave Hufstetler her doctor's note indicating that she needed leave from April 15 to April 19, 2013. (Id. at 23.) On Monday, April 15, 2013, ABF approved Sasser's FMLA request. (Id. at 24.)

On April 16, 2013, unaware that Sasser was on FMLA, Smiley traveled to Nashville to terminate Sasser's employment. On April 17, 2013, Hufstetler emailed Ricke, Smiley, and Wynia to inform them that Sasser was on FMLA leave from April 15, 2013 through May 20, 2013. (Id.) Griesse instructed Ricke and Smiley to wait until Sasser returned from leave to terminate her because terminating her while she was on leave would also discontinue her short-term disability benefits. (Id. at 25.) Ricke and Smiley reassigned Sasser's accounts during her absence. (Id.)

On May 8, 2013, while still on FMLA leave, Sasser submitted a doctor's note to ABF and its third-party leave administrator that she could work light duty from home up to four hours per day until her FMLA leave ended on May 20, 2013. Her doctor did not know when she could return to full duty. (Id.) Sasser planned to make sales calls from home if her light duty was approved.

4

(Id.) ABF denied her request to work from home because it would not allow her to fulfill what she admits were essential functions of the position—making in-person sales visits and participating in client entertainment events. (Id. at 26.) In addition, because her accounts were already being handled by other account managers, Ricke felt that allowing Sasser to make sales calls from home would result in duplication of work and confusion to the customers. (Id.)

On May 19, 2013, in anticipation of Sasser's return to work the following day, Ricke contacted Griesse to confirm the decision to terminate Sasser. Griesse again approved of that plan. (Id.) However, Sasser did not return to work on May 20, 2013. (Id.) Ultimately, on June 27, 2013, Sasser notified Ricke that her doctor had released her to return to work on the following day, Friday, June 28, 2013, with no physical restrictions. (Id.) On July 1, 2013, Ricke informed Sasser of the decision to terminate her employment because of poor job performance. (Id. at 28.) Sasser received short-term disability benefits through ABF during the entire time she was on FMLA leave. (Id.)

## II. Legal Standard

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The Court is required to view "the facts and reasonable inferences in the light most favorable to the nonmoving party . . . ." Ferrari v. Ford Motor Co., 826 F.3d 885, 891 (6th Cir. 2016) (citing Cass v. City of Dayton, 770 F.3d 368, 373 (6th Cir. 2014)).

"Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either (i) agreeing that the fact is undisputed; (ii) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (iii)

5

demonstrating that the fact is disputed." Local Rule 56.01(c). The nonmoving party must support each disputed fact with a "specific citation to the record." Id. If a nonmoving party fails to demonstrate that a fact is disputed, the Court "may . . . consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e)(2). Thus, where the nonmoving party indicates that a fact is disputed but provides no citation to the record or provides a citation that does not, in fact, dispute the statement of fact, the Court will treat the statement as undisputed for purposes of the motion for summary judgment.[1] Id.

## III. Analysis

Sasser alleges the following causes of action: (1) retaliation in violation of the FMLA; and (2) disability discrimination in violation of the ADA, TDA, and THRA. (Doc. No. 1.) ABF moves for summary judgment on each claim. (Doc. No. 23.)

### A. FMLA Retaliation

The FMLA[2] prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). To establish a prima facie case of retaliation under the FMLA, an employee must show that (1) she engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising FMLA rights; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected FMLA activity and the adverse

---

[1] Much of Sasser's response to ABF's statement of undisputed facts is deemed admitted pursuant to Local Rule 56.01(c). This is not Sasser's attorney's first occasion to ignore the Local Rule. Anderson v. McIntosh Const., LLC, No. 3:13-CV-0304, 2014 WL 2207924, at *1 (M.D. Tenn. May 28, 2014), aff'd, 597 F. App'x 313 (6th Cir. 2015) ("[D]espite repeated admonitions from this court in multiple cases brought by plaintiff's counsel, he has continued to ignore the rules governing statements of fact that are required or permitted with respect to Rule 56 motions.")

[2] ABF moves for judgment on an FMLA interference claim, but there are no allegations in the complaint raising such a claim. (Doc. Nos. 1 at 6; 24 at 11-12.) The Court's interpretation of her complaint is buttressed by her response brief that states, "There is no doubt that Defendant granted Plaintiff FMLA leave she requested in this case. . . ." (Doc. No. 28 at 9.)

employment action. Ferrari, 826 F.3d at 888. To establish a causal connection, Sasser must show that the "true motivation" for her termination was not the reason given, but was instead the result of her taking a medical leave of absence. Tennial v. United Parcel Serv. et al., No. 15-6356, 2016 WL 6156315 at *9, — F.3d —, (6th Cir. October 24, 2016).

There is no dispute that Sasser engaged in FMLA protected activity and suffered an adverse employment action. However, the decision to terminate her was made before her accident and her injuries that caused her need for leave. Sasser cannot show that anyone at ABF had knowledge of her FMLA request at the time the decision to terminate her employment was made because she had not made an FMLA request when ABF decided to terminate her employment. Indeed, Sasser does not dispute that four ABF managers—Griesse, Wynia, Ricke, and Smiley—decided to terminate her employment on March 26, 2013, the day before her car accident. (Doc. No. 25-7 at 23 (email); Doc No. 29 at 19-20.) The undisputed evidence establishes that the timing of the decision to terminate and the timing of her FMLA leave make it impossible that Defendant retaliated against her due to her FMLA leave.

Sasser argues that the emails and discussions between Ricke, Griesse, Wynia, and Smiley after her accident and after her FMLA request, as well as her actual termination on July 1, 2013, raise disputed issue of fact on whether ABF actually had decided to terminate her employment before her accident. (Doc. No. 28 at 7.) That ABF had internal discussions about when to proceed with terminating Sasser's employment in light of her accident, request for leave and absence from work, in no way suggests that it ever changed or waivered on its pre-accident decision to terminate Sasser. Indeed, Plaintiff offers no evidence to permit an inference that the pre-accident termination decision was ever in doubt. Her better argument would be that, even though ABF had decided to terminate her employment, once it became aware of her use of FMLA leave, that knowledge

7

became a factor in its decision to follow through with her termination. But again, Plaintiff offers no evidence that AB knowledge of her FMLA accelerated or otherwise effected the March 26, 2013, termination decision. Here, there is simply no evidence to support a finding that Sasser's use of FMLA leave was ABF's "true motivation" for terminating her. Tennial, 2016 WL 6156315 at *9. Sasser has not established a prima facie case of FMLA retaliation. Montell v. Diversified Clinical Servs., Inc., 757 F.3d 497, 507 (6th Cir. 2014) ("When the employer 'proceed[s] along lines previously contemplated,' we must not take the temporal proximity of the adverse employment action as evidence of causality.") (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001)); Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We hold that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation."); Ross-Thornton v. Cont'l Cas. Co., No. 3:05-0675, 2007 WL 954247, at *7 (M.D. Tenn. Mar. 26, 2007) ("Plaintiff concedes that [her supervisor] had already recommended her termination prior to FMLA leave being taken, and hence it would be difficult for Plaintiff to show that taking leave was the reason for her dismissal as required to establish her prima facie case.");.

Furthermore, even if Sasser could establish a prima facie case, she has failed to show that ABF's legitimate non-retaliatory reason for her termination—her continued poor job performance—was pretextual. Eren v. Mars, Inc., 27 F. Supp. 3d 855, 865 (M.D. Tenn. 2014) (nine days between FMLA request and termination were insufficient to prove pretext where plaintiff "was always a poor performer"); Ross-Thornton, 2007 WL 954247, at *7 (employee unable to show pretext in FMLA retaliation case given her "consistent poor performance").

8

## B. Disability Discrimination

The ADA provides that no covered entity shall discriminate against a qualified individual on the basis of a disability. 42 U.S.C. § 12112(a). The ADA defines "disability" as: (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual," (2) "a record of such an impairment," or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C); TENN. CODE ANN. § 4-21-102(3)(A) (TDA) (same). The ADA's definition of "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity." 42 U.S.C. § 12112(b)(5)(A).

Here, Sasser offers no evidence that she had an actual disability because her physical impairments were not permanent and would not qualify for ADA coverage. Nasser v. City of Columbus, 92 Fed. Appx. 261 (6th Cir. 2004) (temporary back injury not disabling); Curry v. Cyprian Ctr., 17 Fed. Appx. 339 (6th Cir. 2001) (temporary condition caused by back injury not disabling); Gleason v. Food City 654, No. 3:13-CV-712-PLR-HBG, 2015 WL 1815686, at *5 (E.D. Tenn. Apr. 22, 2015) ("Generally, short term, temporary restrictions are not 'substantially limiting' and do not render a person disabled under the ADA."). Instead, Plaintiff says she was perceived as having a disability and that ABF's perception that she was disabled drove its decision to terminate her employment and its decision to deny her a reasonable accommodation. Her brief argues:

> Defendant admits that it refused her request for a reasonable accommodation because of their perception that she was disabled, she was temporarily unable to travel. . . . Because of the timing of her termination, on July 1, 2013 after her return

> to work on June 28, 2013, Plaintiff believes that she was terminated in retaliation for having taken FMLA leave and for her perceived disability.

(Doc. No. 28 at 4) (internal citations omitted).

To advance a claim that ABF erroneously perceived her to be disabled, Sasser must show either that ABF mistakenly believed that she had a physical impairment that substantially limited one or more major life activities, or that ABF mistakenly believed that an actual, nonlimiting impairment substantially limited one or more of her major life activities. Spees v. James Marine, Inc., 617 F.3d 380, 396 (6th Cir. 2010). Either way, Sasser must show that ABF "entertain[ed] misperceptions" about her. Id. Sasser has offered no evidence that ABF entertained misperceptions about her that would support a finding that it erroneously perceived her to be disabled. Even if Sasser had attempted to prove that ABF regarded her as disabled, the nature of her injuries would not support such a finding as a matter of law because "the ADA explicitly states that the 'regarded as' definition 'shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.'" White v. Interstate Distrib. Co., 438 Fed. Appx. 415, 420 (6th Cir. 2011) (quoting 42 U.S.C. § 12102(3)(B)). The undisputed facts show that Sasser's injuries were transitory and minor.

Sasser's reasonable accommodation claim also fails. She argues that ABF denied her request for reasonable accommodation because it perceived that she was disabled in that she was temporarily unable to travel. (Doc. Nos. 28 at 4, 10; 29 at 26.) This claim fails because an employer "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong." 29 C.F.R. § 1630.9(e); accord Larson v. Rush Fitness Complex, No. 3:13-CV-73-TAV-HBG, 2014 WL 6090323, at *7 (E.D. Tenn. Nov. 13, 2014). Furthermore, even if Sasser were entitled to an accommodation, ABF had already approved her for FMLA leave for the period of time for which she sought an accommodation. (Doc. No. 29

at 24 (undisputed leave was approved until May 20, 2013)). Last, she cannot show that any disability was the but-for cause of her termination, as required to rebut ABF's legitimate, nondiscriminatory reason for terminating her employment—her continued undisputed poor performance of her job.

### C. State Law Claims

"[I]t is well settled that the THRA does not provide a remedy for discrimination on the basis of disability." Hensley v. Rutherford Cty., Tenn., No. 3:14-CV-0138, 2015 WL 1549272, at *2 (M.D. Tenn. Apr. 8, 2015) (citing Barnes v. Goodyear Tire & Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000). Accordingly, Sasser cannot maintain a separate cause of action under the THRA, and that claim is dismissed.

As to Sasser's TDA claim, courts look to federal cases interpreting the ADA for guidance in interpreting the TDA because of the similarity between the two statutes. Burress v. City of Franklin, Tenn., 809 F. Supp. 2d 795, 817 (M.D. Tenn. 2011) (citing Barnes v. Goodyear Tire and Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000)). However, the "language of the TDA differs from that of the ADA insofar as the former does not contain a 'reasonable accommodation' element." Id. As Sasser's disability discrimination claim is that she was entitled to a reasonable accommodation under the TDA, the claim fails.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** ABF's motion for summary judgment.

The Court will enter an appropriate order.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE